UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DARREN FINDLING as Personal
Representative for the Estate of
JEREMY ALAN GARZA,

Case No. 2:17-cv-00018

Hon. Gordon J. Quist
U.S. District Judge

Plaintiff,

v.

MICHIGAN DEPARTMENT
OF CORRECTIONS, et al.,

Defendants.
_____/

## REPORT AND RECOMMENDATION

### A. Introduction

In 2014, Jeremy Alan Garza tragically took his own life while he was incarcerated at the Marquette Branch Prison (MBP). Plaintiff Darren Findling, a personal representative for Garza's estate, filed this lawsuit against the Michigan Department of Corrections (MDOC) and several of its employees: Warden Napel, Deputy Warden Alexander, Deputy Warden Place, Corrections Officer Wagner, Corrections Officer Kessler, Corrections Officer Viitala[1], Corrections Officer Whitney, Corrections Officer LaForest, Corrections Officer Kutchie[2], and Sergeant Bush. Findling asserts that Defendants were deliberately indifferent to Garza's medical

---

[1]   Findling spelled Defendant Viitala as Vitala in the complaint.
[2]   Findling spelled Defendant Kutchie as Cucchi in the complaint.

needs, in violation of the Fourth, Eighth, and Fourteenth Amendments. He also asserts gross negligence state-law claims against Defendants.

Defendants filed a "Motion for Summary Judgment and Qualified Immunity." (ECF No. 27.) For the reasons stated below, the undersigned respectfully recommends that the Court grant in part and deny in part Defendants' motion. If the Court adopts this Report and Recommendation, the remaining claims in this case will be deliberate indifference and gross negligence claims against Defendants Kutchie and LaForest.

### B. Factual Allegations

Prior to committing suicide, Garza had a history of mental health problems. Medical records show that Garza had been diagnosed with a mood disorder, polysubstance dependence, post-traumatic stress disorder, ADHD, substance related disorder, borderline personality disorder, and antisocial personally disorder. (ECF No. 31-2, PageID.348.) Garza's "Treatment Plan/Review" from April 4, 2014 shows that he had a difficult upbringing. (ECF No. 31-4. PageID.366-374.) As a child, he was physically abused, sexually abused, and struggled with a learning disability in school. (ECF No. 31-4. PageID.366.)[3]

On August 14, 2013, Garza was transferred from the Kinross Correctional Facility to the Level V section of MBP. (ECF No. 31-2, PageID.350.) He spent the next eight months in administrative segregation at MBP. For approximately four to six of

---

[3] The undersigned notes that the parties dispute the type of items that were removed from Garza's cell.

2

those months, Garza's cell was located next to the cell of another inmate, Michael Delaney. (ECF No. 31-5, PageID.378.)

On April 10, 2014, at around 8:15 A.M., Garza was escorted to a visit with his mother, Barbara Garza. (ECF No. 28-2, PageID.152.) The officers on duty in Garza's unit at this time included Defendants Kutchie, LaForest, and Viitala, as well as Corrections Officer Royea. (ECF No. 31-7, PageID.414.) While Garza was visiting with his mother, Defendants Kutchie and LaForest shook down Garza's cell and removed various magazines and letters. (ECF No. 31-7, PageID.421.)

When Garza returned to his cell at around 10:30 A.M., he became irate because of the missing items. (ECF No. 31-5, PageID.380.) According to Inmate Delaney, Garza asked for his property back and, when the officers refused, he asked to see the shift commander, Defendant Viitala. (ECF No. 31-5, PageID.380.) Both of Garza's requests were denied, and he began to scream that he needed to see his psychologist. (ECF No. 31-5, PageID.380.) Someone then told Garza to "sit [his] faggot ass down." (ECF No. 31-5, PageID.380.) Garza began screaming that he was going to kill himself if a psychologist or shift commander did not come to see him. (ECF No. 31-5, PageID.381.) The officers then walked away from Garza's cell. (ECF No. 31-5, PageID.381.)

At this time, Delaney and another inmate attempted to calm Garza down, which appeared to work until the officers made their rounds and walked past Garza's cell. (ECF No. 31-5, PageID.381-382.) Similarly, Garza calmed down briefly when Nurse Gluesing came to his cell to give him his daily medication at approximately

3

10:41 A.M. (ECF No. 31-5, PageID.381-382 and ECF No28-2, PageID.155.) But when the officers conducted security rounds past Garza's cell, he started screaming again that he was going to kill himself if he did not get to see his psychologist. (ECF No. 31-5, PageID.382.) One of the guards allegedly told Garza to "quit playing games" and "go ahead." (ECF No. 31-5, PageID.382.) Garza responded that he was going to hang himself. (ECF No. 31-5, PageID.382.) The officer allegedly replied: "well, go ahead and do it. You are not going to do it. You just had a visit. You are not a lifer. You are close to going home." (ECF No. 31-5, PageID.382.)

After the officers walked away from Garza's cell, Delaney and another inmate again attempted to talk to Garza. (ECF No. 31-5, PageID.383.) But Garza went silent two to three minutes after the officers left. (ECF No. 31-5, PageID.383.) Both Defendants Kutchie and Viitala, who were talking in Defendant Viitala's office nearby, also noticed that Garza became silent. (ECF No. 28-2, PageID.154.)

After noticing the silence, Defendant Kutchie went to Garza's cell to check on his temperament before making his rounds to serve lunch trays. (ECF No. 31-7, PageID.426.) When he arrived at the cell, Defendant Kutchie saw Garza with a bedsheet around his neck that was tied to the sprinkler pipe and one of his knees on a footlocker. (ECF No. 31-7, PageID.426.) Because Defendant Kutchie was concerned that Garza was faking, he summoned help and dispersed a chemical agent into the cell. (ECF No. 31-7, PageID.426.) When Garza did not respond, Defendant Kutchie and Officer Royea entered the cell, untied the bedsheet, and laid Garza on the ground. (ECF No. 31-10, PageID.464.) They attempted to perform CPR, which was difficult

because of the chemical agent. (ECF No. 31-10, PageID.464.) Shortly thereafter, additional staff arrived to help. (ECF No. 28-2, PageID.154-155.) At 11:24 A.M., an ambulance arrived at MBP to transport Garza to the hospital. (ECF No. 28-2, PageID.155.) At 11:58 A.M., Garza was pronounced dead. (ECF No. 28-2, PageID.155.)

The next day, Inmate Delaney sent a letter to Garza's mother detailing the incident. (ECF No. 31-11, PageID.470.) Delaney explained that Garza returned to his cell and noticed that the officers took some of his property. (ECF No. 31-11, PageID.470.) Delaney further explained that Garza said he was going to kill himself and "they all started laughing at him saying go ahead at which time he hung himself[.]"(ECF No. 31-11, PageID.470.)

### C. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing

5

the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### D. Analysis

Findling asserts deliberate indifference and gross negligence claims against the MDOC and each individual Defendant. The undersigned will analyze these claims in three separate groups. First, the undersigned respectfully recommends that the Court grant summary judgment in favor of the MDOC based on Eleventh Amendment immunity. Second, the undersigned respectfully recommends that the Court grant summary judgment in favor of Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, and Bush because they were not personally involved in any of the allegations in this case. Third, as further described below, the undersigned respectfully recommends that the Court grant summary judgment in favor of Defendant Viitala, but deny the motion for summary judgment as to Defendants Kutchie and LaForest. If the Court adopts these recommendations, only Defendants Kutchie and LaForest will remain in the case.

### 1. Michigan Department of Corrections

It is well-established that a plaintiff may not maintain a § 1983 action against the MDOC. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978);

*O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment. *See, e.g., McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000). In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under § 1983 for money damages. *see Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)). Therefore, the undersigned respectfully recommends that the Court find that the MDOC is entitled to summary judgment and dismiss it from this case.

### 2. Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, and Bush

Findling next asserts claims against Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, and Bush. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). To establish personal liability under § 1983, the plaintiff must show that each defendant charged "caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In other words, A

7

claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). Mere failure to act does not amount to personal involvement. *Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998)).

Here, Findling has not presented any evidence to establish that Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, and Bush were involved in any of the events described in the complaint. Defendant Kessler is identified only in the caption of the complaint and not mentioned in the body of the complaint. Although Defendants Napel, Alexander, Place, Wagner, Whitney, and Bush are mentioned in the body complaint, there are no specific allegations against any of these Defendants. As Defendants' brief correctly notes, "[n]either the critical incident report, Prisoner Delaney's testimony, nor the testimony of Defendants Viitala and Kutchie mention the presence of Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, or Bush in Garza's unit when he committed suicide." (ECF No. 28, PageID.142.) Notably, Findling does not even address any of these Defendants in his response brief. Instead, it appears that Findling concedes that these Defendants were not personally involved in the events described in the complaint.

Similarly, with respect to the gross negligence claims, Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, and Bush cannot be found liable when Findling has not presented any evidence to establish that any of them were involved in any events described in the complaint. *See McNeal v. Dep't of Natural Resources*,

8

364 N.W.2d 768, 771-72, 140 Mich. App. 625, 632 (Mich. App.1985) ("[I]f the complaint does not include allegations of subsequent negligence, plaintiff has failed to state a claim of gross negligence.").

In the opinion of the undersigned, Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, and Bush did not have sufficient personal involvement to establish liability on any of the claims. Therefore, the undersigned respectfully recommends that the Court dismiss these Defendants from this case.

### 3. Defendants Kutchie, LaForest, and Viitala

Findling asserts that Defendants Kutchie, Viitala, and LaForest (1) were deliberately indifferent to Garza's medical needs in violation of the Fourth, Eighth, and Fourteenth Amendments, and (2) were grossly negligent.

#### a. Constitutional Claims

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Although Findling asserts deliberate indifference claims under the Fourth, Eighth, and Fourteenth Amendment, the Eighth Amendment provides the proper framework in this case because Garza was a convicted prisoner. *See Cooper v. Cnty of Washtenaw*, 222 F. App'x 459, 464, 2007 WL 557443, at *4 (6th Cir. 2007) ("Plaintiff properly bases the underlying violation upon the Eighth Amendment because Morton was a convicted prisoner at the time of his suicide."). *See also Burgess v. Fischer*, 735 F.3d 462, 476

(6th Cir. 2013) (determining that the Due Process Clause of the Fourteenth Amendment applies to deliberate indifference claims asserted by pretrial detainees); *Ruth v. Mich. Dep't. of Corrections*, 2014 WL 1319685, at *4 (E.D. Mich. Apr. 1, 2014) (dismissing a Fourth Amendment claim asserted by an MDOC inmate because the court was "unable to ascertain the basis" of the claim and applying the Eighth Amendment framework to the deliberate indifference claim). Accordingly, the undersigned will apply the Eighth Amendment framework to the deliberate indifference claims.[4]

### b. Qualified Immunity Standard

Defendants assert that they are entitled to qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

---

[4] Although the undersigned notes that Eighth Amendment provides the proper framework, caselaw suggests that there is little difference between deliberate indifference medical claims under the Eighth Amendment and deliberate indifference medical claims under the Fourteenth Amendment. *See Grabow v. Cnty. of Macomb*, 580 F. App'x 300, 307 (6th Cir. 2014) (stating that the rights are "analogous" under both amendments).

"Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In making a qualified immunity determination, the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 232. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. *Id.* The court may consider either approach without regard to sequence. *Id.*

### i. Whether the Alleged Facts Make Out a Constitutional Violation

The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). A prison official violates the Eighth Amendment when the official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* A serious medical

11

need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

First, the undersigned must determine whether Findling can satisfy the objective prong of the deliberate indifference test. Here, there is no question that the objective prong is met. The Sixth Circuit "has held that a prisoner's 'psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.'" *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Horn v. Madison Cnty.*, 22 F.3d 653, 660 (6th Cir. 1994)). Here, Garza had a history of mental health issues, screamed that he would kill himself if he did not see his psychiatrist, and ultimately committed suicide.

Next, the undersigned must determine whether Plaintiff can satisfy the subjective prong of the deliberate indifference test as to each Defendant. "[T]he

12

proper inquiry in a case where an inmate has committed suicide is 'whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.'" *Cooper v. Cnty. of Washtenaw*, 222 F. App'x 459, 466 (6th Cir. 2007) (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).

<u>Defendants Kutchie and LaForest</u>

Defendants Kutchie and LaForest were the Corrections Officers on duty in Garza's unit on April 10, 2014. It is undisputed that Defendants Kutchie and LaForest had some interaction with Garza on the morning he committed suicide. Both Defendants searched Garza's cell, removed some of Garza's property, and were present when Garza became agitated about his missing property.

But the parties dispute what happened next. According to Inmate Delaney, both Corrections Officers were present when Garza began screaming that he needed to see his psychologist and that he was going to kill himself when his requests were denied. (ECF No. 31-5, PageID.380.) Defendant Kutchie denies hearing Garza make any threats of suicide or self-harm. (ECF No. 31-7, PageID.424.) Instead, in the Critical Incident Report, Defendants Kutchie and LaForest wrote that Garza was threatening them. (ECF No. 28-2, PageID.162-163.)

In addition, Delaney claims that one of the Corrections Officers told Garza to "sit his faggot ass down" and "well, go ahead and do it. You are not going to do it. You just had a visit. You are not a lifer. You are close to going home." (ECF No. 31-5,

13

PageID.382.) Although Delaney did not know the Corrections Officer's name, Findling asserts that the description of the Corrections Officer fits the description of Defendant Kutchie. Defendant Kutchie denies making either one of these statements. (ECF No. 31-7, PageID.424.) Defendants further dispute Delaney's version of events and claim that, even assuming such statements were made, Delaney likely could not see who made the statements. Moreover, Defendant Viitala also testified that he heard other prisoners telling Garza to "kill himself." (ECF No. 31-9, PageID.446.)

Ultimately, the undersigned finds that these are questions of material fact that must be resolved by a jury. Specifically, a genuine issue of material fact exists as to whether Specifically, a genuine issue of material fact exists as to whether Defendants Kutchie and LaForest subjectively perceived facts from which to infer Garza's risk of suicide, that Defendants Kutchie and LaForest did in fact draw the inference, and that Defendants Kutchie and LaForest then disregarded the risk. For example, if Garza requested to see his psychologist and threatened to kill himself, and, in response Defendants LaForest and Kutchie refused to get Garza medical help and, instead, Defendant Kutchie told Garza to "go ahead" and kill himself, then Defendants LaForest and Kutchie would have been deliberately indifferent to Garza's medical needs.

As a result, the undersigned concludes that genuine issues of material fact exist regarding (1) whether Kutchie and LaForest subjectively perceived facts from which to infer Garza's risk of suicide, (2) whether they did, in fact, draw that inference, and (3) whether they then disregarded the risk,

Defendant Viitala

Defendant Viitala was the shift commander in Garza's unit on April 10, 2014. He had much less interaction with Garza than Defendants LaForest and Kutchie. Notably, Defendant Viitala appears to have had no face-to-face interaction with Garza until after Garza hung himself. Instead, Defendant Viitala remained in his office during the entire incident, which was approximately twenty feet away from Garza's cell. Despite being in his office, Defendant Viitala could hear some of the incident. He recalls hearing a lot of yelling and believes that other prisoners were telling Garza to kill himself. (ECF No. 31-9, PageID.446-447.)  There is no evidence to establish that Defendant Viitala knew that Garza was contemplating suicide or self-harm. In the opinion of the undersigned, there is no evidence that Defendant Viitalasubjectively perceived facts from which to infer Garza's risk of suicide, that Defendant Viitala did in fact draw the inference, and that Defendant Viitala then disregarded the risk. Therefore, the undersigned respectfully recommends that the Court dismiss Defendant Viitala from this case.

### ii. Whether the Constitutional Right was Clearly Established

Because Findling has presented sufficient evidence to establish a genuine issue of material fact regarding the alleged constitutional violations by Defendants Kutchie and LaForest, the undersigned must also determine whether the right was clearly established in 2014. For a right to be clearly established, "the right's contours [need to be] sufficiently definite that any reasonable official in the defendant's shoes would

have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014).

As the Sixth Circuit explained in *Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001),

> This circuit has consistently recognized a prisoner's established right to medical attention once the prisoner's suicidal tendencies are known. See *Williams*, 186 F.3d at 691 (recognizing implicitly that suicidal condition is serious medical condition which requires medical attention and relying on *Estelle*, 429 U.S. at 105-06, for principle that "the right at issue is [prisoner's] right not to have his serious medical needs treated with deliberate indifference"); *Horn*, 22 F.3d at 660 (recognizing that prisoner's psychological needs may constitute serious medical needs which require medical attention, especially when they result in suicidal tendencies); *Danese*, 875 F.2d at 1244 (noting that if officials have knowledge that prisoner is suicidal, they cannot ignore his needs).

*Comstock*, 273 F.3d at 711. Thus, in 2014, it was clearly established a prisoner has a right to medical attention once the prisoner's suicidal tendencies are known. In this case, as described above, a genuine issue of material fact exists regarding whether Defendants Kutchie and LaForest knew of Garza's suicidal tendencies and refused to get him medical attention.

### c. State Law Claims - Gross Negligence

Findling finally asserts gross negligence state law claims against Defendants.[5] In their motion for summary judgment, Defendants assert that they are entitled to

---

[5] The undersigned notes that Findling mentions both negligence and gross negligence under the heading of Count III in his complaint. (ECF No. 1, PageID.12.) Findling did not address simple negligence claims in his response brief. To the extent that Findling is pursuing simple negligence claims against Defendants, those claims

16

the statutory immunity under Mich. Comp. Laws § 691.1407, the Governmental Immunity from Tort Liability Act. That Act grants immunity from certain claims if the following elements are satisfied:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2)

Defendants first argue that their conduct did not amount to gross negligence. The statute defines gross negligence as, "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws. § 691.1407(7)(a). The Sixth Circuit has observed that gross negligence under Michigan law is equivalent to deliberate indifference under Eighth Amendment analysis. *Quigley v. Thai*, 707 F.3d 675, 686 (6th Cir. 2013). As described above, the undersigned finds that there are issues of material fact as to whether Defendants Kutchie and LaForest were deliberately indifferent to Garza's medical needs. Thus,

---

are no longer actionable against governmental employees and the other individuals listed in Mich. Comp. Laws § 691.1407(2).

viewing the evidence in the light most favorable to the Findling, a reasonable jury could find that Defendants Kutchie's and LaForest's "conduct [was] so reckless as to demonstrate a substantial lack of concern for whether an injury result[ed]." Mich. Comp. Laws. § 691.1407(7)(a).

Defendants also argue that they were not the proximate cause of Garza's death because Garza caused his own death. The Michigan Supreme Court has defined proximate cause as "the one most immediate, efficient, and direct cause preceding an injury, not 'a proximate cause.'" *Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307, 311 (2000). The fact that an inmate committed suicide does not mean that no other conduct could be the proximate cause to that inmate's death. *See Johnson v. Williams*, 2017 WL 4236548, at *12 (E.D. Mich. Sept. 25, 2017) (denying summary judgment because there was a question of fact as to whether the defendants' conduct was the proximate cause of a suicide). Here, according to Inmate Delaney, one of the Corrections Officers – either Defendant Kutchie or Defendant LaForest – told Garza to "go ahead" and kill himself. Garza then committed suicide two to three minutes later. In the opinion of the undersigned, this evidence, if viewed in a light most favorable to Plaintiff, is sufficient to create a question of fact as to whether Defendants Kutchie's and LaForest's conduct was the proximate cause to Garza's death.

### E. Recommendation

Accordingly, the undersigned respectfully recommends that that the Court grant Defendants' motion for summary judgment as to the claims against the MDOC

and Defendants Napel, Alexander, Place, Wagner, Kessler, Whitney, Bush, and Viitala. The undersigned further recommends that the Court deny Defendants' motion for summary judgment as to the claims against Defendants Kutchie and LaForest.

If the Court adopts this Report and Recommendation, the remaining claims in this case are deliberate indifference and gross negligence claims against Defendants Kutchie and LaForest.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: September 11, 2019

                                                    /s/ *Maarten Vermaat*
                                                    MAARTEN VERMAAT
                                                    U.S. MAGISTRATE JUDGE